van Gestel, J.
This matter comes before the Court on two motions, each seeking to have the second amended complaint dismissed pursuant to Mass.R.Civ.P. Rule 12(b)(2) for lack of jurisdiction over the movants. The first filed motion is by the defendant ABB Ltd.[3] The second filed motion is by the defendant Alstom Power N.V.

BACKGROUND

To some extent, the identity of the parties and their relationships to one another are vastly more complicated than the underlying contractual and related issues. Much of this background is taken, as it should be at this time and for purposes of these motions, from the second amended complaint, although some comes from outside sources properly provided by the parties.

The Parties

The plaintiff PDC-EI Paso Meriden, LLC is a Connecticut limited liability company with a usual place of business in Boston, Massachusetts. At all times material, it was engaged in the business of energy project development, power plant design and construction, and power plant operation. It consists of El Paso Meriden Power I Company, a Delaware corporation with a usual place of business in Houston, Texas; El Paso Meriden Power II Company, also a Delaware corporation with a usual place of business in Houston, Texas; and plaintiff Power Development Company, LLC (“PDC”), a Delaware limited liability company with a usual place of business in Boston, Massachusetts.
The plaintiff El Paso Merchant Energy-Gas Company is a Delaware corporation with its usual place of business in Houston, Texas. Along with El Paso Meriden Power I Company and El Paso Meriden Power II Company, it is engaged internationally in the business of providing specialized services in fuel supply, power marketing, energy trading, asset restructuring and energy product development.
In the second amended complaint the plaintiffs are referred to, and will be here, collectively as “Meriden Power.”
The defendant Alstom Power, Inc. is a Delaware corporation with its usual place of business in Windsor, Connecticut. It is the successor in interest to ABB Power Generation, Inc., a Delaware corporation with its usual place of business in Midlothian, Virginia. In the second amended complaint, and here, ABB Power Generation, Inc. and Alstom Power, Inc. are referred to collectively as “ABB/Alstom US.”
For a very brief period in 1999, ABB / Alstom US was an indirect subsidiary of ABB Ltd.[4] ABB Ltd. is a Swiss corporation with its principal place of business in Zurich, Switzerland. It is described in the complaint as a global company that was engaged in the business of providing, among other things, technology and services in the fields of power generation, transmission and distribution. It is further alleged to have manufactured and sold, throughout the world, gas turbines for electric generating plants. ABB Ltd. is said to have maintained subsidiaries and to have conducted oper *644 ations in a number of jurisdictions, including Massachusetts and Connecticut.[5]
In 1999, ABB Ltd. transferred its gas turbine power segment (including ABB/Alstom US) to ABB Alstom Power N.V. ABB Alstom Power N.V. was a joint venture corporation alleged to be organized under the laws of Belgium[6] with a principal place of business in Brussels, Belgium. Between mid-1999 and early 2000, ABB Alstom Power N.V. was controlled and managed jointly by ABB Ltd. and by Alstom S.A., a French corporation with its principal place of business in Paris, France.
In early 2000, ABB Ltd. transferred to Alstom S.A. its one-half interest in ABB Alstom Power N.V. Alstom Power N.V. then became the new name for the joint venture previously known as ABB Alstom Power NV. In the Alstom Annual Report 1999/2000 the former joint venture is described as “a joint company” in which Alstom became “the sole owner of the power company” nine months later, in March 2000. Significantly to this Court, Alstom did not describe what it now wholly owned, Alstom Power N.V., as a group of separate corporate entities or anything else other than a single, large, and world-market-dominating enterprise.
Alstom Power N.V. and the joint venture corporation which previously was called ABB Alstom Power N.V. are referred to collectively in the second amended complaint as “Alstom Europe.” This Court chooses not to do so here.
The defendant Black & Veatch Construction, Inc. (“Black & Veatch”) is a Missouri corporation with its usual place of business in Kansas City, Missouri.
The defendant Black & Veatch and ABB /Alstom US are referred to collectively in the second amended complaint, and will be here, as “the Consortium.”

Jurisdiction and Venue

The second amended complaint asserts jurisdiction over all defendants pursuant to G.L.c. 223A, Sec. 3, and asserts that venue is proper pursuant to G.L.c. 223, Sec. 8.

Electric Industry Restructuring

In 1998, consistent with other New England states, Connecticut enacted legislation providing for the restructuring of the electric industry. The purpose of the legislation was to encourage and allow for a sufficient number of in-state power generating facilities to ensure a reliable supply of electric power and the development of a competitive electrical market for the benefit of the area. This restructuring legislation ushered in a new competitive marketplace for power generation. It provided non-utility power producers with an immediate incentive to construct power plants in the region.

The Meriden Project

By the Spring of 1998, Meriden Power was formed and, among other projects, was in the process of developing a 544 MW electric generating facility to be located on a 36-acre parcel in Meriden, Connecticut (the “Meriden Project”).
Between April 1998 and July 1998, the Consortium of ABB/Alstom US and Black & Veatch provided extensive technical assistance to Meriden Power in connection with the Meriden Project. Through their participation in the permitting work, the Consortium knew that the Meriden Project was scheduled to achieve commercial operation as early as June 2001.
After negotiations during June and July 1998, it is alleged in the second amended complaint that the Consortium and Meriden Power “signed an agreement for the Meriden Project in Boston, Massachusetts on July 22, 1998 (the ‘Meriden Contract’), by which the Consortium agreed to design and build the Meriden Project for Meriden Power at the turnkey price of $217 million (which included two ABB GT-24 turbines), plus site-specific costs and escalation.”[7]
The second amended complaint does not indicate the source of the two “ABB GT-24 turbines.” Attached as Exhibit E to the Affidavit of Debra K. Mayfield, however, is “a true and correct copy of portions of Appendix 7 of the Combined Cycle Power Plant Engineer, Procure and Construct Contract for the Milford Project, Draft 2, dated June 18, 1998.” The attached document bears the heading “GT 24 Single Shaft Technical Book.” In Section 2.1 of the Technical Book is what purports to be “a general outline of the material equipment and services to be furnished by ABB.” The particular “ABB” referred to is the ABB/Alstom US that was part of the Consortium. The first piece of equipment described is “One (1) Asea Brown Boveri (ABB) gas turbine block Type 24B.” Later in the document there is reference to what is described as a “set of mechanical auxiliaries to ABB gas turbine GT24.”
According to the assented-to joint motion to modify second amended complaint, allowed on August 15, 2001, the term “Asea Brown Boveri, Ltd.” was an incorrect reference to ABB Ltd. Supposedly, there presently is no Swiss entity with the name Asea Brown Boveri, Ltd.[8] There is, however, enough in the “record” for this Court to draw the inference that the GT-24 turbines were manufactured by some ABB entity located in Europe — probably ABB Power Generation Ltd. in Baden, Switzerland — and not by the successor to ABB Power Generation, Inc. in the United States.
The second amended complaint proceeds with allegations relating to the efforts regarding the Meriden Project up to the points of alleged repudiation. Those allegations are not recited here because they have no direct effect on the issues of personal jurisdiction that underlie the motions to dismiss.

Repudiations

It is alleged that in early 1999, the worldwide demand for power plant projects and turbines, which had been flat for several years, greatly increased. As a *645 result, the price of turbines supplied by one of the ABB entities, and the turnkey power plant prices charged by vendors and constructors such as ABB/Alstom US and Black & Veatch, increased dramatically. It is further alleged that in this connection in May 1999, Black & Veatch signalled that it would not perform its obligations under the Meriden Contract unless Meriden Power increased the total contract price by over $19 million. There followed discussions to save the Meriden Project from failure and to resolve the issues raised by Black & Veatch’s repudiation of its contractual obligations.
In mid-1999, while discussions were under way between Black & Veatch and Meriden Power, ABB Ltd. transferred most of its power generation business to ABB Alstom Power N.V., the newly created joint venture with Alstom S.A. In July 1999, the new management of ABB Alstom Power N.V. concluded that the Meriden Project would generate insufficient profit margins at the price that previously had been agreed upon. It is alleged that ABB Alstom Power N.V. and ABB/Alstom US resolved that they would break the contract with Meriden Power.
Between July 1999 and November 1999, ABB/Alstom US and ABB Alstom Power N.V. are alleged to have concealed from Meriden Power their intentions to break the contract. They continued to assert that they could and would complete the project by June 2002 at the contractually agreed-upon price.
In early November 1999, Meriden Power was on the verge of resolving its dispute with Black & Veatch. At this point, allegedly to prevent the Meriden Project from proceeding, ABB/Alstom US announced that it was repudiating and ceasing performance under the Meriden Contract. It is further alleged that later in November 1999, ABB/Alstom US, acting with the knowledge and direction of ABB Alstom Power N.V., stated to Meriden Power that turbines could be made available for the Meriden Project at an increased price and with lower performance guaranties.
Included as Exhibit 47 in the Affidavit of Kathleen A. Burdette, an attorney for the plaintiffs, is a copy of what appears to be an e-mail transmittal dated December 16, 1999, from “Francesco Starace/CHKRA/ABB” to five individuals designated as “Yves Car els / CHKRA/ABB@ABB_CHKRA, Beat Imwinkelried/CHKRA/ABB@ABB_CHKRA, Werner Leiberherr /USPGE/ABB@ABBUSPGE, Chris Broemmelsiek / USPGE /ABB@ABB_USPGE Arthur Kenworthy/USPGE/ABB@ABB_USPGE.”
In other documents in the “record” Starace was described as “head of global sales for ABB gas turbine combine cycle business” in Baden, Switzerland; Beat Imwinkelried worked for Starace; Yves Car els was said to work as a sales manager under Imwinkelried; Werner Lieberherr was employed as president at ABB Power Generation, Inc. and Alstom Power, Inc. in the United States; Chris Broemmelsiek was vice president for power development for ABB Power Generation, Inc. and Alstom Power, Inc. in the United States; and Arthur Kenworthy was a sales project manager at ABB Power Generation, Inc. and Alstom Power, Inc. in the United States.
The e-mail stated that its subject was “Meriden” and read, in its entirety, as follows:
Claude Darmon has asked NOT to proceed with the submission of the Meriden offer under the present conditions and price levels.
Please suspend the submission and call me for clarifications.
Claude Darmon was the President and Chief Executive Officer of ABB Alstom Power N.V. at the time of that e-mail.

The Counts in the Complaint

The second amended complaint contains ten separate counts, all but the first of which include claims against ABB Ltd. and Alstom Power N.V. Count II is for breach of contract; Count III is for quantum meruit; Count IV is for the breach of the covenant of good faith and fair dealing; Count V is for intentional interference with contract; Count VI is for intentional interference with advantageous relationship; Count VII is for misrepresentation; Count VIII is for reliance/estoppel; Count IX is for violation of G.L.c. 93A; and Count X is for violation of Conn. Gen. Stat. Sec. 42-1 lOg.

Contentions of the Movants

Both ABB Ltd. and Alstom Power N.V. contend that they are not qualified to do business in Massachusetts, do not regularly do business in Massachusetts, do not solicit business in Massachusetts and did not do anything in Massachusetts in connection with the Meriden Power parties or the Meriden Project. Each of ABB Ltd. and Alstom Power N.V. say that they are merely holding companies with small management staffs and no operating personnel, and that they do no business whatsoever with gas turbine power generation.
ABB Ltd. did not come into being until March 5, 1999, when it was formed in Zurich, Switzerland. ABB Ltd. first became active as a company on June 28, 1999, when, through a corporate reorganization, it became the parent and holding company for what is generally referred to as the ABB Group of companies. As a result, ABB Ltd. became the indirect parent company of ABB Power Generation, Inc. for approximately two days. As of July 1, 1999, ABB Power Generation, Inc., together with several other entities of the ABB Group of companies engaged in the power generation business, was transferred to ABB Alstom Power N.V. It was ABB Alstom Power N.V. that was owned 50% by ABB Ltd. and 50% by Alstom S.A. Then, in May 2000, Alstom S.A. acquired the 50% interest in ABB Alstom Power N.V. owned by ABB Ltd. As a result, Alstom S.A. became the sole owner of ABB *646 Alstom Power N.V., which now is known as Alstom Power N.V.
The effect of the creation of ABB Ltd. is described in Notes to Consolidated Financial Statements as follows:
ABB Ltd. is a global technology company organized in five industrial business segments and a financial services segment, with each segment having global responsibility for its business and its manufacturing and product development activities, as applicable.
In June 1999, ABB Ltd., a newly incorporated Swiss company, issued approximately 295 million registered shares to the stockholders of ABB AB, a Swedish publicly listed company, and ABB AG, a Swiss publicly listed company. As of that date neither ABB AB nor ABB AG had operations or assets other than their respective 50% ownership interests in ABB Asea Brown Boveri Ltd. In exchange, the stockholders of ABB AB and ABB AG tendered all issued shares of the two companies except for 3% of total issued ABB AB stock. The stockholders of ABB AB who did not tender their shares for ABB Ltd. shares received cash of $438 million in return for their shares of ABB AB and the equivalent number of registered shares of ABB Ltd. (approximately 5 million) were sold to third parties, resulting in a total of 300 million shares of ABB Ltd. stock as of June 28, 1999.
By the foregoing, ABB Ltd. became, among other things, the owner of ABB Asea Brown Boveri Ltd.

The Matrix System of Management

The ABB Group of companies utilized what is referred to as a matrix system of management. The ABB Group claims to have followed strict internal rules pursuant to which all business executives were trained and obligated to respect corporate formalities and the boundary lines of each company. In any event, they argue that certain so-called Business Area managers were not employed by ABB Ltd. but instead were employed at various ABB operating company levels.
The plaintiffs contend that the matrix management system utilized by the ABB Group of companies resulted in an entity that engaged in business as a seamless whole that followed directives and business plans crossing corporate and national divides. The plaintiffs describe “Business Areas” within “Segments” that enable executives of one ABB company to direct the activities of other companies without respect for corporate formalities or traditional parent-subsidiary relationships.
ABB Ltd. concedes that the manufacturing center for gas turbines and the overall responsibility for the gas turbine business of the ABB Group of companies was based in Baden, Switzerland and organized within the entity previously known as ABB Power Generation Ltd. That company, ABB Ltd. says, is now a wholly owned subsidiary of Alstom Power N.V.
ABB Ltd. further says that while ABB Power Generation Ltd. was originally a part of the ABB Group of companies, it at all times operated independently of its parent company and did not report on an operational basis to its parent company.

DISCUSSION

A motion seeking dismissal pursuant to Mass.R.Civ.P. 12(b)(2) for lack of jurisdiction over the person is different from motions under the other Rule 12(b) grounds. The plaintiff — Meriden Power here— and not the moving defendants — ABB Ltd. and Alstom Power N.V. — "has the burden of establishing the facts upon which the question of personal jurisdiction over a defendant is to be determined." Droukas v. Divers Training Academy, Inc., 375 Mass. 149, 151 (1978), adopting the language in Nichols Assocs. v. Starr, 4 Mass.App.Ct. 91, 93 (1976).
In resolving a challenge to jurisdiction over the person, the Court must view all facts relevant to the jurisdictional issue in the light most favorable to the plaintiff, accepting as true all uncontroverted facts that the plaintiff submits in support of its assertions. Tatro v. Manor Care, Inc., 416 Mass. 763, 765 (1994).
As is customary in most Rule 12(b)(2) motions, the Court must turn to the Massachusetts longarm statute, G.L.c. 223A, Secs. 1-3, and also consider constitutional due process issues.
Generally, a claim of personal jurisdiction over a non-resident defendant presents a two-fold inquiry: (1) is the assertion of jurisdiction authorized by statute, and (2) if authorized, is the exercise of jurisdiction under State law consistent with basic due process requirements mandated by the United States Constitution? Jurisdiction is permissible only when both questions draw affirmative responses. Since we have stated that our longarm statute . . . functions as “an assertion of jurisdiction over the person to the limits allowed by the Constitution of the United States,” . . . the two questions tend to converge. General Laws c. 223A, Sec. 3, cannot authorize jurisdiction which is constitutionally unacceptable, even though the fact pattern asserted in support of jurisdiction apparently satisfies that statute’s literal requirements. Likewise, G.L.c. 223A, Sec. 3, asserts jurisdiction over the person to the constitutional limit only when some basis for jurisdiction enumerated in the statute has been established.
Good Hope Industries, Inc. v. Ryder Scott Co., 378 Mass. 1, 5-6 (1979). See also Stanton v. AM General Corporation, 50 Mass.App.Ct. 116, 117 (2000).
The longarm statute warrants quotation, at least in part. For the purposes of the present motions, Sec. 3 reads as follows:
*647 A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person’s
(a) transacting any business in this commonwealth;
(b) contracting to supply services or things in this commonwealth;
(c) causing tortious injury by an act or omission in this commonwealth;
(d) causing tortious injury in this commonwealth by an act or omission outside the commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue .from goods used or consumed or services rendered, in this commonwealth . . .
There is no question but that jurisdiction is properly in this Court over the entity that is now called Alstom Power, Inc., formerly known as ABB Power Generation, Inc. It was one of the two entities that made up the Consortium alleged to have signed in Boston the agreement with Meriden Power that anticipated the designing and building of the Meriden Project. Thus, to the extent there was a contract and it was breached, or to the extent there were misrepresentations resulting in damages, Alstom Power, Inc., in its present and former incarnation, falls within the reaches of G.L.c. 223A, Secs. 3(b) and (d), and quite possibly Secs. 3(a) and (c) as well.
The questions for this Court are whether ABB Ltd. or Alstom Power N.V. can be said to fall within any one of the four Section 3 sub-parts quoted above.
The longarm statute reaches persons acting directly “or by an agent.” Thus, the Court must determine whether Alstom Power, Inc. can be considered to be an agent of either ABB Ltd. or Alstom Power N.V. in connection with the Meriden Project. If there is such an agency relationship, it is not one that shines brightly. Rather, the Court is left to search through the thicket that is the matrix of the ABB Group of companies. In that search, a case peculiarly well known to this Court may serve as a compass. My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614 (1968), is one of the most frequently cited cases on the issue of piercing the corporate veil.[9] The oft quoted language from My Bread reads:
Although common ownership of the stock of two or more corporations together with common management, standing alone, will not give rise to liability on the part of one corporation for the acts of another corporation or its employees, additional facts may be such as to permit the conclusion that an agency or similar relationship exists between the entities. Particularly is this true (a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting. In such circumstances, in imposing liability upon one or more .of a group of “closely identified” corporations, a court “need not consider with nicety which of them” ought to be held liable for the act of one corporation “for which the plaintiff deserves payment.”
Id. at 619.
Here, the matrix of the ABB Group certainly provides “a confused intermingling of activity of two or more corporations engaged in a common enterprise.” There is also found in the matrix a “serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting.” This conclusion by the Court should come as no surprise to ABB Ltd. or Alstom Power N.V. It is precisely what Percy Barnevik, president and CEO of ABB Asea Brown Boveri,[10] told the Harvard Business Review in its March/April 1991 edition interview. Mr. Barnevik said — and the allegations of the complaint and documents presented in connection with these motions support his statement:
ABB is an organization with three internal contradictions. We want to be global and local, big and small, radically decentralized with centralized reporting and control. If we resolve those contradictions, we create real organizational advantage.
That’s where the matrix comes in. The matrix is the framework through which we organize our activities. It allows us to optimize our businesses globally and maximize performance in every country in which we operate. Some people resist it. They say the matrix is too rigid, too simplistic. But what choice do you have? To say you don’t like a matrix is like saying you don’t like factories or you don’t like breathing. It’s a fact of life. If you deny the formal matrix, you wind up with an informal one— and that’s much harder to reckon with. As we learn to master the matrix, we get a truly multidomestic organization.
Harvard Business Review, March-April 1991, p. 95.
ABB Power Generation, Inc. was a part of a matrix of ABB companies which, for a short period of time in June of 1999, ABB Ltd. was the holding company at the top. By July of 1999, ABB Power Generation, Inc. had become ABB Alstom Power, Inc.; and ABB Alstom Power N.V. (owned 50% by ABB Ltd. and 50% by Alstom S.A.) was the holding company at the top of the matrix. Then, by mid-2000, ABB Alstom Power, Inc. became Alstom Power, Inc.; and Alstom *648 Power N.V. became the new name for the holding company at the top of the matrix. It is important to note that Alstom Power N.V. is not a successor or different entity from ABB Alstom Power N.V.; it is the same Dutch Naamloze Vennootschap (N.V.) dressed up with a new name. However, its shareholders are now one, Alstom S.A., instead of two, Alstom S.A. and ABB Ltd.
Even the foregoing structure, however, seems not enough to say that “an agency or similar relationship exists” between Alstom Power, Inc. or its corporate predecessors and ABB Ltd. or Alstom Power N.V. There must be shown “active and direct participation” by ABB Ltd. or Alstom Power N.V. with Alstom Power, Inc. or its predecessors.
Here the Court views ABB Ltd. and Alstom Power N.V. differently. There has been no showing by Meriden Power that there was any active, significant or direct participation or control by ABB Ltd. in the affairs of Alstom Power, Inc. or its predecessors with regard to the Meriden Project. Proof of such significant control is necessary to establish jurisdiction over a parent company for its subsidiaries’ activities. See Kleinerman v. Morse, 26 Mass.App.Ct. 819, 823 (1989); Cabot Safety Intermed. Corp. v. Akron Safety Equip., Inc., 12 F.Sup.2d 180, 181-82 (D.Mass. 1998).
However, such proof has been presented by Meriden Power with regard to ABB Alstom Power N.V., now named Alstom Power N.V. That active and direct participation was most clearly seen — but not solely — in the December 16, 1999, e-mail from Francesco Starace in Baden, Switzerland, reporting that Claude Darmon, the President and Chief Executive Officer of Alstom Power N.V., asked “NOT to proceed with the submission of the Meriden offer.” This is not the kind of action expected of a head of a simple holding company with no operating personnel that does no business whatsoever with gas turbine generation. Rather, it is the command of the senior-most official of a global enterprise organized to optimize its business and maximize performance in every country where it operates. Claude Darmon clearly expected that his directive not to proceed with the Meriden Project would be obeyed and control the actions of all in the matrix below him, including particularly Alstom Power, Inc.
This Court sees nothing in the restraints imposed by the Due Process clause of the United States Constitution that would prevent it from exercising jurisdiction over Alstom Power N.V. See, e.g., Tatro v. Manor Care, Inc., supra, 416 Mass. at 772-73. Alstom Power N.V. purposefully established minimum contacts in the Commonwealth. See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474-75 (1985). Indeed, through its matrix, Alstom Power N.V. seems to have purposefully achieved the position of being “radically decentralized with central reporting and control” that Mr. Barnevik touted to the Harvard Business Review in 1991 was the essence of the matrix. It appears to have more than minimum contacts in many jurisdictions.

ORDER

For the foregoing reasons, the motion to dismiss of ABB Ltd. is ALLOWED; and the motion to dismiss of Alstom Power N.V. is DENIED.[11]

 Because the letters “ABB” are used in many different contexts, for many different entities, the Court will not use them as an abbreviation for this particular defendant's name.

 Originally, the second amended complaint mistakenly referred to ABB Ltd. as “Asea Brown Boveri Ltd.” By an assented-to joint motion, allowed on August 15, 2001, the correction of the term “Asea Brown Boveri Ltd." to “ABB Ltd.” was accomplished.

 The Court is aware that ABB Ltd., in its opposition papers, describes itself as being merely a holding company.

 This allegation appears to be in error. From other filings, the Court is of the belief that ABB Alstom Power N.V., although based in Brussels, Belgium, was organized under the laws of The Netherlands. At this point, nothing turns on this distinction.

 There is some confusion in the “record” before the Court. As noted, the allegation in the second amended complaint is that an agreement was signed on July 22, 1998. Attached as Exhibit A to the Affidavit of Debra K. Mayfield, an attorney representing Alstom Power, Inc. and Alstom Power N.V., is a document in which the Meriden Project and the Consortium “agree to craft a Letter of Understanding” which includes a variety of provisions relating to the entry into an “EPC contract with the Consortium at a price of $217 million” for the Meriden facility.

 Other information in the “record” suggests that in 1987 a venerable Swedish company called Asea merged with an equally venerable Swiss company called Brown Boveri to become Asea Brown Boveri headquartered in Zurich, Switzerland. The Court is not able to trace the current existence of Asea Brown Boveri or its involvement in the Meriden Project, if any, but clearly it is the source of the “ABB” mark used by so many entities involved in this case.

 In actuality, My Bread is not really a veil-piercing situation in the traditional sense. Rather, the court there reached from one corporation to find liability in another corporation with common ownership by a route that carried it up to common stockholders and then down again to the other corporation.

 See n. 8.

 The Court, although having considered the content of some filings outside of the allegations of the second amended complaint, has treated both motions as motions to dismiss under Mass.R.Civ.P. Rule 12(b) and not as motions for summary judgment under Rule 56. After discovery is expanded or completed, the Court will accept, if appropriate, motions pursuant to Rule 56.