van Gestel, J.
This matter comes before the Court on two motions, each seeking summary judgment pursuant to Mass.R.Civ.P. Rule 56 in connection with *15 the second amended complaint (the “complaint”). The first docketed motion is by the defendant Black & Veatch Construction, Inc. (“BVCI”) (Paper #190). The second docketed motion is by the defendants Alstom Power, Inc. and Alstom Power, N.V. (collectively “Alstom”) (Paper #191).
BACKGROUND
On May 31, 2002, this Court filed a memorandum and order on motions to dismiss by ABB, Ltd. and by Alstom Power, N.V. The motion of ABB, Ltd. was allowed; and the motion of Alstom Power, N.V. was denied. [14 Mass. L. Rptr. 643.] Some of what follows in this background section is taken from the earlier memorandum on the motions to dismiss.
The Parties
The plaintiff PDC-E1 Paso Meriden, LLC (“PDC-E1 Paso”) is a Connecticut limited liability company with a usual place of business in Boston, Massachusetts. At all times material, it was engaged in the business of energy project development, power plant design and construction, and power plant operation. PDC-EL Paso consists of; El Paso Meriden Power I Company, a Delaware corporation with a usual place of business in Houston, Texas; El Paso Meriden Power II Company, also a Delaware corporation with a usual place of business in Houston, Texas; and plaintiff Power Development Company, LLC, a Delaware limited liability company with a usual place of business in Boston, Massachusetts.
The plaintiff El Paso Merchant Energy-Gas Company is a Delaware corporation with its usual place of business in Houston, Texas. Along with El Paso Meriden Power I Company and El Paso Meriden Power II Company, it is engaged, internationally, in the business of providing specialized services in fuel supply, power marketing, energy trading, asset restructuring and energy product development.
In the second amended complaint the plaintiffs are collectively referred to, and will be here, as “Meriden Power.”
The defendant Alstom Power, Inc. is a Delaware corporation with its usual place of business in Windsor, Connecticut. It is the successor in interest to ABB Power Generation, Inc., a Delaware corporation with its usual place of business in Midlothian, Virginia. In the second amended complaint, and here, ABB Power Generation, Inc. and Alstom Power, Inc. are referred to collectively as “ABB/Alstom US.”
In 1999, ABB, Ltd. — no longer a defendant here— transferred its gas turbine power segment (including ABB/Alstom US) to ABB Alstom Power, N.V. ABB Alstom Power, N.V. was a joint venture corporation organized under the laws of The Netherlands with a principal place of business in Brussels, Belgium. Between mid-1999 and early 2000, ABB Alstom Power, N.V. was controlled and managed jointly by ABB Ltd. and by Alstom, S.A., a French corporation with its principal place of business in Paris, France.
In early 2000, ABB, Ltd. transferred to Alstom, S.A. its one-half interest in ABB Alstom Power, N.V. Alstom Power, N.V. then became the new name for the joint venture previously known as ABB Alstom Power, N.V. In the Alstom Annual Report 1999/2000, the former joint venture is described as “a joint company” in which Alstom became “the sole owner of the power company” nine months later, in March 2000.
Alstom Power, N.V. and the joint venture corporation which previously was called ABB Alstom Power, N.V. are referred to collectively in the second amended complaint as “Alstom Europe.” This Court chooses not to do so here.
The defendant BVCI is a Missouri corporation with its usual place of business in Kansas City, Missouri.
The defendant BVCI and ABB/Alstom US are referred to collectively in the second amended complaint, and will be here, as “the Consortium.”
Electric Industry Restructuring
In 1998, consistent with other New England states, Connecticut enacted legislation providing for the restructuring of the electric industry. The purpose of the legislation was to encourage and allow for a sufficient number of in-state power generating facilities to ensure a reliable supply of electric power and the development of a competitive electric market for the benefit of the area. This restructuring legislation ushered in a new competitive marketplace for power generation. It provided non-utility power producers with an immediate incentive to construct power plants in the region.
Development of Power Plants
The development of power plants is extremely complex, and it is somewhat uncertain. Once it is decided to build a power plant, the development stage begins. During this stage, the parties begin the process of obtaining some 40 to 50 permits needed to construct the plant. This phase alone is expensive and typically can consume two to three years with no guarantee of success.
If the development phase is successful, an “engineer, procurement and construction” contract (“EPC”) is negotiated and executed. These contracts provide for the complex engineering of the plant and its constituent equipment, the procurement of the turbines and related other major pieces of equipment and all aspects of the actual physical construction of the plant and installation and testing of the turbines therein. Two prior EPC contracts involving the parties here are the Agawam EPC Contract and the Milford EPC Contract. Each of these contracts included an agreement with 32 sections, together with 18 exhibits and 10 appendices, all totaling more than 1,000 pages. The EPC Contract price for Agawam was $121,336,000; and for Milford, was $235,803,400. The process of developer, turbine builder/producer and constructor *16 coming together to create the ultimate EPC relationship is lengthy, complex and without guaranty of success.
Construction starts with the developer/owner issuing a Notice to Proceed to the contractor, which typically is after a final closing, once financing is assured. The construction of power plants like the one at issue here takes an additional two to three years after the Notice to Proceed. Delivery of the plant to the owner occurs upon Substantial Completion. A “turnkey power plant," as contemplated here, is one that is fully operational when transferred to the owner.
Prior Projects
The relationship between the parties here began in 1995, when they first discussed the development of a power plant in Agawam, Massachusetts, using a single ABB GT-24 gas turbine. During the development of the Agawam project, the parties considered the development of at least three additional projects in Milford and New Milford, Connecticut, and in Westfield, Massachusetts. The proposal for these three projects was reflected in a 32-page Memorandum of Understanding dated February 28, 1997 (the “3 project MOU”). These three projects were to be either single turbine/single train facilities like Agawam or two turbine/dual train facilities, with base prices to be $120,000,000 or $224,000,000 respectively.
The parties agree that the 3 project MOU was not a commitment to build those plants. In fact, only the Milford Project ever resulted in a final EPC contract, financing and actual construction.
The Meriden Project
By the spring of 1998, Meriden Power was formed and was in the process of developing a 544-megawatt electric generating facility to be located on a 36-acre parcel in Meriden, Connecticut (the “Meriden Project”).
Between April 1998 and July 1998, the Consortium of ABB/Alstom US and BVCI provided extensive technical assistance to Meriden Power in connection with the Meriden Project. Through their participation in the permitting work, the Consortium knew that the Meriden Project was originally projected to achieve commercial operation as early as June 2001.
After negotiations during June and July 1998, it is alleged in the second amended complaint that the Consortium and Meriden Power “signed an agreement[3] for the Meriden Project in Boston, Massachusetts on July 22, 1998 [the ‘July 1998 document’], by which the Consortium agreed to design and build the Meriden Proj ect for Meriden Power at the turnkey price of $217 million (which included two ABB GT-24 turbines), plus site-specific costs and escalation.”
The July 1998 document, and the obligations thereunder, play a maj or role in the motions now before this Court. Because of its significance, the document is quoted here at some length.
1. The Meriden Project and the Consortium agree to craft a Letter of Understanding (LOU), separate from the 3 project MOU, which includes the following provisions:
1.1 The Meriden Project commits to enter into an EPC contract with the Consortium at a price of $217 million and with generally the same terms as the Agawam EPC Contract excluding the operating guarantees (availability, degradation, etc.). The EPC price of $217 million is based on the general scope of supply stated in the Milford Technical Scope Document, Draft 2 dated June 18, 1998 revised as stated in 1.1.1 through 1.1.3 below. The $217 million EPC price will remain in effect until July 1, 1999. Escalation of the EPC price will begin on July 1, 1999 if Notice to Proceed has not been given by that date. The parties agree to negotiate in good faith the specific details of the general scope of supply that is included in the $217 million EPC price. The parties further agree that site specific items are not included in the $217 million EPC price and that the cost of such items will be negotiated in good faith.
1.1.1 The Consortium will provide 2 x 100% (installed) Boiler Feed Pumps (BFP) per unit, total of 4 installed BFPs at the Meriden Plant. The warehouse spare is deleted.
1.1.2 The Consortium will design the facility to include the interconnection facilities necessary to permit removal of either Auxiliary Transformer and replacement with the spare auxiliary transformer.
1.1.3 The facility will-be designed to export to the grid on a net basis the Guaranteed Net Electric Output at a power factor of 0.85.
1.2 BVCI will be paid monthly for Meriden permitting support services (up to a total of $400,000.00 for the Meriden Project) at a 1.65 payroll multiplier plus expenses (deducted from EPC price). This deduction from the EPC price will be credited in the first construction draw.
1.3 ABB will provide development funding up to $1.5 MM with a success fee of 12.5%. The development funding provided by ABB for Meriden may be used for any development purpose other than payments to PDC or to direct employees of PDC or Wellfleet Capital.
1.4 PDC and ABB agree to participate in good faith negotiations concerning provision of a Hot Gas Path Protection Plan at $375 per EOH, escalated from July 1, 2001 onward, for the Meriden Project. PDC has no obligation to enter into a “plant operations” contract with ABB for the Meriden Project. If PDC and ABB do not enter into a plant operations contract, PDC agrees that ABB will be paid a reasonable fee for the administration of the Hot Gas Path Protection Plan. If PDC and ABB enter into a plant *17 operations contract, ABB will include in the EPC contract the same operating guarantees (availability, degradation, etc.) that are included in the Agawam EPC contract.
1.5 ABB agrees to stock recommended spares for the Static Frequency Converter (SFC) in the USA. In the event that ABB and PDC do not enter into an O&M agreement for Meriden, PDC agrees to stock operational spares for the SFC and related systems. In the event of a failure of the SFC that causes an inability to start one or both of the gas turbines, ABB guarantees that SFC parts will be delivered to the Meriden site within 24 hours of written notice by PDC to ABB. If ABB fails to deliver such SFC part within 24 hours of written notice and if that failure delays the restart of one or both of the gas turbines, ABB will pay liquidated damages in the amount of ten thousand dollars ($10,000) per day per unit that restart is delayed. If the restart of one or both gas turbines is delayed due to ABB’s failure to deliver SFC spare parts, and if ABB is already paying liquidated damages under the EPC availability guarantees, then ABB shall not also be required to pay the ten thousand dollar liquidated damages described above.
2. The MOU for the Milford Project will be amended as follows: [Here there follow Sections 2.1 through
2.6 relating solely to the Milford Project which are similar, but not identical, to Sections 1.1 through 1.5 quoted above.]
3. PDC’s right to cancel for convenience is deleted for the Summit Project.
The MOU amendments in items 2 through 2.5 and 3 are contingent upon acceptance of items 1 through 1.5 above. All other terms of the MOU remain unchanged and the MOU will continue in full force and effect for the Milford and Summit Projects.
[The document is then signed on behalf of “BVCI,” “Power Development Company, LLC,” “ABB Power Generation Inc.” and “El Paso Energy.”]
The second amended complaint proceeds with allegations relating to the permitting and other efforts regarding the Meriden Project up to the points of alleged repudiation.
The Alleged Repudiations
It is alleged that in early 1999, the worldwide demand for power plant projects and turbines, which had been flat for several years, greatly increased. As a result, the price of turbines supplied by one of the ABB entities, and turnkey power plant prices charged by vendors and constructors such as ABB/Alstom US and BVCI, increased dramatically. It is further alleged that in this connection at a May 13, 1999, meeting, BVCI signaled that it would not perform under the July 1998 document unless Meriden Power increased the total EPC contract price by over $19 million. Actually, what BVCI did was propose certain site-specific adders for the Meriden Project. Included among those adders were charges relating to anticipated costs required to attract and keep skilled construction craft labor on the site during a time of high demand in New England. Meriden Power challenged these labor costs as not being site-specific adders. There followed discussions to save the Meriden Project from failure and to resolve the issues raised by BVCI’s alleged repudiation of its contractual obligations. In mid 1999, while discussions were under way between BVCI and Meriden Power, ABB Ltd. transferred most of its power generation business to ABB Alstom Power, N.V., the newly created joint venture with Alstom, S.A. In July 1999, the new management of ABB Alstom Power, N.V. concluded that the Meriden Project would generate insufficient profit margins at the price that previously had been agreed upon. It is alleged that ABB Alstom Power, N.V. and ABB/Alstom US resolved that they would break the “contract” with Meriden Power.
Between July 1999 and November 1999, ABB/Alstom US and ABB Alstom Power, N.V. are alleged to have concealed from Meriden Power their intentions to break the arrangement. In fact, they continued to assert that they could and would complete the project by June 2002 at the agreed-upon price.
In early November 1999, Meriden Power was on the verge of resolving its dispute over site-specific adders with BVCI. At this point, allegedly to prevent the Meriden Project from proceeding, ABB/Alstom US is said to have signalled that it was ceasing performance under the July 1998 document. It is more specifically alleged that later in November 1999, ABB/Alstom US, acting with the knowledge and direction of ABB Alstom Power, N.V., stated to Meriden Power that turbines could be made available for the Meriden Project only at an increased price and with lower performance guaranties.
An e-mail dated December 16, 1999, was transmitted from “Francesco Starace/CHKRA/ABB” to five individuals designated as: Yves Carels/CHKRA/ABB@ABB_CHKRA; Beat Imwinkelried/ICHKRA/ABB@ABB_CHKRA; Werner Leiberherr /USPGE/ABB @ABB_USPGE; Chris Broemmelsiek/USPGE/ABB@ABB_USPGE; and Arthur Kenworthy/USPGE/ABB@ABB_USPGE. Francesco Starace, at the time of this e-mail, was described as “head of global sales for ABB gas turbine combine cycle business” in Baden, Switzerland: Beat Imwinkelried worked for Starace; Yves Carels was said to work as a sales manager under Imwinkelried; Werner Lieberherr was employed as president at ABB Power Generation, Inc. and Alstom Power, Inc. in the United States; Chris Broemmelsiek was vice president for power development for ABB Power Generation, Inc. and Alstom Power, Inc. in the United States; and Arthur Kenworthy was a sales project manager at ABB *18 Power Generation, Inc. and Alstom Power, Inc. in the United States.
The e-mail stated that its subject was “Meriden” and reads, in its entirety, as follows.
Claude Darmon has asked NOT to proceed with the submission of the Meriden offer under the present conditions and price levels.
Please suspend the submission and call me for clarifications.
At the time of that e-mail, Claude Darmon was the President and Chief Executive Officer of ABB Alstom Power, N.V.
Despite these various actions, the parties continued negotiations well into the year 2000, with no ultimate success in reaching agreement on an EPC. For example, at a January 28, 2000, meeting in Cincinnati, the parties were only $15 to $20 million apart on final price, and Meriden Power admitted that “significant progress” had been made, the schedule on the turbine delivery issues was “O.K,” and the turbine performance decreases would be accepted.
Albeit said to be part of a proposed settlement,[4] the parties reached a December 13, 1999, Reservation Agreement to “reserve a place in [the] production schedule for manufacturing the Turbines such that [Alstom] can deliver the Turbines to the Meriden Project site no later than May 31, 2001 for the first turbine and August 1, 2001 for the second turbine in time to achieve Commercial Operation of both units for the Meriden Project by June 1, 2002.”
For reasons nowhere explained in the summary judgment record, after the Cincinnati meeting the parties’ negotiations effectively ceased, with no EPC contract in place.[5] As of that time, Meriden Power did not have all of the necessary permits in place, had yet to apply for financing and certainly had not issued a Notice to Proceed.
By late March of 2000, Meriden Power initiated efforts to sell the Meriden Project. In December 2000, Meriden Power entered into a purchase and sale agreement to sell the unconstructed and partially permitted Meriden Project and related land rights to an entity owned by NRG, Inc. for $24.5 million. That sale closed in December 2001. As a result, Meriden Power sustained no out-of-pocket losses for the Meriden Project and, instead, made a handsome net profit after reimbursing themselves for their costs.
The Counts in the Complaint
The second amended complaint contains ten separate counts. At oral argument, counsel for the plaintiffs advised the Court that Count III (against all defendants) for quantum meruit and Count VIII (against all defendants) for reliance/estoppel each have been withdrawn. The remaining counts are: Count I (against ABB/Alstom US and BVCI) for breach of contract; Count II (against Alstom) also for breach of contract; Count IV (against all defendants) for the breach of the covenant of good faith and fair dealing; Count V (against Alstom) for intentional interference with contract; Count VI (against Alstom) for intentional interference with advantageous business relationship; Count VII (against ABB/Alstom US and Alstom) for misrepresentation; Count IX (against all defendants) for violation of G.L.c. 93A; and Count X (against all defendants) for violation of Conn. Gen. Stat. Sec. 42-1 lOg.
DISCUSSION
Summary judgment is appropriate where there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. Opara v. Massachusetts Life Insurance Company, 441 Mass. 539, 544 (2004); Lindsay v. Romano, 427 Mass. 771, 773 (1998); Hakim v. Massachusetts Insurers’ Insolvency Fund, 424 Mass. 275, 283 (1997); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating that there is no triable issue of fact. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989).
Before stating its conclusions, this Court pauses to observe that all parties in this case are extremely sophisticated, all certainly had constant advice and assistance from highly competent counsel, and all benefitted from their prior experience with the Agawam and Milford projects. This sophisticated group negotiated and chose specific language to state their intentions in the July 1998 document. Here, there was no disparity in bargaining power or lack of sophistication about the matter at hand. Where knowledgeable and fully represented parties choose to embody their relationship in a carefully crafted document,[6] they are entitled to and should be held to the language they chose.
The Court must be careful not to impose its own views on the contracting parties or to let matters outside the four comers of the instrument that are specifically anticipated and addressed therein overwhelm or change the document itself. “[Agreements are made to be performed, and relief should be given in the absence of special circumstances showing that it would be inequitable to do so.” Freedman v. Walsh, 331 Mass. 401, 406 (1954). No special circumstances have been demonstrated here. It is not the role of the Court to alter the parties’ arrangement. “Even if it be found that the [July 1998 document], according to its true meaning . . . fails to become operative, it is not for the [C]ourt, in order to give it operation, to suppose a meaning which the parties have not expressed . . .” Shoe & Leather Nat’l Bank v. Dix, 123 Mass. 148, 150 (1877). Once again, this is not a time for the Court to attempt to be smarter than the parties.
The motions’ resolutions here depend to a great degree upon a proper interpretation of the July 1998 document itself. These are questions of law for the *19 Court. Lumber Mut Ins. Co. v. Zoltek Corp., 419 Mass. 704, 707 (1995). “In the absence of an ambiguity, [the Court] will ‘construe the words of the [document] in their usual and ordinary sense.’ ”116 Commonwealth Condominium Trust v. Aetna Casualty & Surety Company, 433 Mass. 373, 376 (2001). The mere fact that parties disagree on the proper construction of a document’s language does not necessarily establish an ambiguity. Lumbermans Mut Cas. Comp. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995).
The document is, however, to be read in light of the circumstances of its execution, which may enable a Court to see whether its words can be understood or are actually ambiguous. Robert Industries, Inc. v. Spence, 362 Mass. 751, 753 (1973).
When an element of ambiguity does appear in a document, the Court considers the entire instrument and the general scheme it reveals to determine the significance and meaning of the ambiguous terms. MacDonald v. Gough, 326 Mass. 93, 96 (1950). “The object of the [Court] is to construe the [document] as a whole, in a reasonable and practical way, consistent with its language, background and purpose.” USM Corp. v. Arthur D. Little Systems, Inc., 28 Mass.App.Ct. 108, 116 (1989). The Court must act in a way to give effect to the July 1998 document as a rational business instrument in order to carry out the intent of the parties. Starr v. Fordham, 420 Mass. 178, 192 (1990). Even in the case of an ambiguous document, interpretation is a matter of law for the Court except insofar as it may turn on facts in genuine dispute. Gross v. Prudential Ins. Co. of America, Inc., 48 Mass.App.Ct. 115, 119 (1999).
Justice, common sense and the probable intention of the parties upon consideration of the words in question are guides to the construction of a written document. City of Haverhill v. George Brox, Inc., 47 Mass.App.Ct. 717, 720 (1999).
In assessment of the dominant legal issues presented by the two motions here, the Court has been told by counsel for Meriden Power that, despite the vast array of cases cited in the motion papers, the basic law is stated principally in three cases: Situation Management Systems, Inc. v. Malouf, Inc., 430 Mass. 875 (2002); McCarthy v. Tobin, 429 Mass. 84 (1999); and Lafayette Place Associates v. Boston Redevelopment Authority, 427 Mass. 509 (1998). However, none of these cases wholly answers the questions posed.
Situation Management, the most recent of the three cases, includes in 430 Mass, at p. 878 the following general comment.
It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement [citing McCarthy] ... It is not required that all terms of the agreement be precisely specified, and the presence of undefined or unspecified terms will not necessarily preclude the formation of a binding contract [citing Lafayette] . . . The parties must, however, have progressed beyond the stage of “imperfect negotiation.”
The part of McCarthy cited in Situation Management appears in 429 Mass, at p. 87. It reads:
The controlling fact is the intention of the parties. See Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 706 (1992), quoting Kuzmeskus v. Pickup Motor Co., 330 Mass. 490, 493 (1953) (“It is a settled principle of contract law that ‘[a] promise made with an understood intention that it is not to be legally binding, but only expressive of a present intention, is not a contract’ ”); Levenson v. L.M.I. Realty Corp., 31 Mass.App.Ct. 127, 130 (1991).
Both Situation Management and McCarthy cite to Lafayette Place. Situation Management cites to Lafayette Place in 427 Mass, at pp. 517-17 & n.9; and McCarthy cites to Lafayette Place in 427 Mass, at p. 518. What is being cited, starting at p. 517, reads as follows.
We adhere to the principle that “[a]n agreement to reach an agreement is a contradiction in terms and imposes no obligation on the parties thereto” ... in the circumstances that justify and give rise to it: where parties have merely reached the stage of “imperfect negotiation” prior to formalizing a contract, and have not yet reduced their agreement to terms . . . When parties have progressed beyond that stage, however, a competing principle applies: a contract should be interpreted “so as to make it a valid and enforceable undertaking rather than one of no force and effect.” Rules of contract must not preclude parties from binding themselves in the face of uncertainty. If parties specify formulae and procedures that, although contingent on future events, provide mechanisms to narrow present uncertainties to rights and obligations, their agreement is binding.
Footnote 9 in Lafayette reads:
As Judge Leval has said, “Notwithstanding the importance of protecting negotiating parties from involuntaryjudicially imposed contract, it is equally important that courts enforce and preserve agreements that were intended as binding, despite aneed for further documentation or further negotiation. It is, of course, the aim of contract law to gratify, not to defeat, expectations that arise out of intended contractual agreement, despite informality or the need for further proceedings between the parties.”
Yet another case that gets cited in at least two of the three noted above is Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703 (1992). A segment of Schwanbeck that is relevant appears at pp. 706-07, as follows.
*20 It is a settled principle of contract law that “[a] promise made with an understood intention that it is not to be legally binding, but only expressive of a present intention, is not a contract.” Kuzmeskus v. Pickup Motor Co., 330 Mass. 490, 493 (1953). Phoenix Spring Beverage Co. v. Harvard Brewing Co., 312 Mass. 501, 506 (1942). Wellington v. Anthorp, 145 Mass. 69, 74 (1887). It is also elementary that an unambiguous agreement must be enforced according to its terms. Freelander v. G.&K. Realty Corp., 357 Mass. 512, 516 (1970). There is no ambiguity in the letter of intent between the [parties here]. The parties clearly stated certain contractual commitments to which they were binding themselves and, just as clearly, they followed those commitments with an expression of their intention to proceed to negotiate in good faith. That this expression of intent follows the parties’ disclaimer of binding effect and begins with the word “however” does not elevate its status from a mere expression of intent into a binding obligation.
It is with this general legal background that the Court assays the July 1998 document.
Breach of Contract Issues
Did the parties commit to enter into an EPC contract with generally similar terms as the Agawam contract, “excluding the operating guarantees,” for $217, “based on the general scope of supply in the Milford draft,” or did they simply agree to negotiate in good faith the specific details of an EPC contract with the general scope of supply and the $217 million EPC price, among others, as starting points?
Did the parties reach agreement “on the material terms” of a contract to engineer, procure and construct a power plant in Meriden, Connecticut?
Did the parties intend to be bound by the July 1998 document as a contract to engineer, procure and construct a power plant in Meriden, Connecticut?
Was the July 1998 document merely an agreement to reach an agreement wherein the parties only reached a stage of “imperfect negotiation” prior to formalizing a contract, or had they progressed beyond that stage such that the document is a valid and enforceable understanding?
With the July 1998 document, did the parties elevate their status from a mere expression of intent into a binding obligation to engineer, procure and construct a power plant in Meriden, Connecticut?
Meriden Power contends that the July 1998 document constitutes a “preliminary” agreement that locks down the material terms under which the developer and the contractor would enter an EPC contract upon completion of the permitting process. They suggest that norms exist for the customary resolution of the subjects left for negotiation. They urge that the parties specified formulae and procedures that, although contingent on future events, provide mechanisms to narrow present uncertainties as to rights and obligations.
BVCI and Alstom claim — correctly—that there never was an EPC contract and that the July 1998 document is not the substantial equivalent thereof. Further, citing to the 3 project MOU, the defendants point to the fact that the Meriden Project agrees that the 3 project MOU was not a commitment to build three plants and, therefore, the July 1998 document should not be considered an agreement to build a single plant either. Rather, BVCI and Alstom say, the 1998 document was merely a first step in a long process leading — unsuccessfully, here — to a possible EPC contract.
This Court accepts the defendants’ position that the July 1998 document was only a starting point for the parties. It also agrees that, to a limited extent at least, the July 1998 document was an agreement binding on the parties. The question for decision then is what did the July 1998 document bind the parties to do?
At p. 12 in its brief in opposition, Meriden Power proffers a satirical interpretation of the July 1998 document that would result if the defendants’ contentions were adopted in full. Meriden Power’s proffer presents an obviously absurd business situation which this Court does not credit. At the same time, and in a similarly sardonic vein, this Court considered the result of embracing the totality of Meriden Power’s position and came away unwilling to interpret the July 1998 document as constituting a binding agreement to engineer, procure and construct a power plant at a definite Meriden, Connecticut, location for an agreed-upon price of $217 million. This is, after all, a project to construct a very large building, for a veiy special purpose, which includes and must accommodate two veiy special, and very expensive, electrical turbines. A simple paper making an offer to purchase a specified condominium for a particular price can, when accepted, blossom into an enforceable contract to buy the property, see e.g., McCarthy v. Tobin, 429 Mass. 84 (1999), but much more must be included to achieve a binding commitment for the kind of significant engineering, procurement and construction project under consideration here.
Thus, what the parties intended by the July 1998 document was to provide Alstom with the security of knowing that it would be the exclusive party to provide the turbines for the Meriden Project, to provide BVCI with the security of knowing that it would be the construction contractor therefor, and to provide Meriden Power with the security of knowing that, aside from site-specific adders and certain other related matters, the project would cost in the vicinity of $217 million. Aside from this, the parties agreed to do no more than proceed to the development phase and, if successful, negotiate in good faith toward an EPC.
What next was needed to advance the Meriden Project beyond the development phase, however, and *21 what never came into being, was an EPC contract containing the details necessary to proceed with the engineering, procurement and construction. The situation posited by Meriden is like agreeing to design and build a two-hundred-million-dollar, special-purpose building with nothing more for guidance than the equivalent of a Greater Boston Real Estate Board Offer to Purchase accepted by a seller, but without any detailed construction contract. This would not be an interpretation of the document that gives it the effect of a rational business instrument.
A purported contract which is no more than an agreement to agree in the future on essential terms, or one which does not adequately specify essential terms, ordinarily will be unenforceable. See Geo. W. Wilcox, Inc. v. Shell B. Petroleum Prod, Inc., 283 Mass. 383, 390; Caggiano v. Marchegiano, 327 Mass. 574, 579; Jacoby v. Koufman, 344 Mass. 761, 762; St Regis Paper Co. v. Hubbs & Hastings Paper Co., 235 N.Y. 30, 36; SunPrinting & Publishing Ass’n v. Remington Paper & Power Co., Inc., 235 N.Y. 338, 345-47; Ansorge v. Kane, 244 N.Y. 395, 398. See also Williston, Contracts (3d ed.) §§37-42, 45-49; Corbin, Contracts, §§95-102.
Air Technology Corp. v. General Electric Co., 347 Mass. 613, 626 (1964). See also Bell v. B.F. Goodrich Co., 359 Mass. 763 (1971); Vitale v. Russell 332 Mass. 523, 525-26 (1955).
The July 1998 document, in its essence, presents an agreement to negotiate and does not create a binding contract to do more than that. It is a starting point only. To hold more would result in an agreement that is void for vagueness. Restatement 2d: Contracts, §32 (Tent, draft No. 1, April 13, 1964). Bell, supra, 359 Mass, at 763. See also Caggiano, supra, 327 Mass, at 580; Lyman v. Robinson, 14 Allen (96 Mass.), 242, 254 (1867) (“Their negotiations remained incomplete, and neither party became bound”).
Normally the fact that parties contemplate the execution of final written documents justifies a strong inference that the parties do not intend to be bound by earlier negotiations or agreements until the final terms are settled. Rosenfield v. United States Trust Co., 290 Mass. 210, 216 (1935). Wasserman v. Roach, 336 Mass. 564, 568 (1958). Taken in context, a reasonably informed participant in a commercial venture would realize that [the July 1998 document was not adequate to govern the engineering, procurement and construction activities contemplated]. With final terms still to be hammered out, the parties could not be bound. Geo. W. Wilcox, Inc. v. Shell Eastern Petroleum Prod., Inc., 283 Mass. 383, 387, 390 (1933). Rosenfleld v. United States Trust Co., 290 Mass, at 217. Saxon Theatre Corp. v. Sage, 347 Mass. 662, 666 (1964). Blair v. Cifrino, 355 Mass. 706, 709-10 (1969).
Tull v. Mr. Donut Development Corp., 7 Mass.App.Ct. 626, 630 (1979).
In the situation before the Court, there never was an EPC contract because the parties never completed their negotiations thereon. Indeed, this lawsuit was filed on December 17, 1999, just four days after the parties reached the December 13, 1999, Reservation Agreement for the production schedule for manufacturing the turbines to be used in the Meriden Project.
The July 1998 document was, as stated in his deposition by Thomas Atkins, PDC’s Project Manager, “a starting point agreement.” More specifically, he said:
... I think it’s important to note that what we were using was the latest Milford status of the EPC negotiation to determine what was our agreement on Meriden, at least our starting point agreement; and understanding everybody understood that there would be changes, x, y and z in different directions laterally, up, down, price, scope, all those things; but what we fixed was at least what we were starting from, you know, various deltas over what we were going to proceed with; but we needed to have a starting point in order to proceed.
A more direct characterization was provided by John DeTore, a PDC-E1 Paso principal and one of its legal counsel. In his deposition the following question and answer are found:
Q. And Mr. DeTore, this July 22nd, 1998, agreement was not intended to be the EPC for Meriden; was it?
A. No, it was not an EPC contract.
No Court, if asked, could enforce specific performance of the engineering, procurement and construction of the Meriden Project predicated solely on the July 1998 document, even with the other documents relating to the Agawam EPC Contract and the Milford Technical Scope Document, Draft No. 2, in hand, without itself inserting or providing significant terms and conditions. But it specifically “is not the role of the [C]ourt to alter the parties’ agreement.” Rogaris v. Albert 431 Mass. 833, 835 (2000).
What happened in the period from May of 1999, when BVCI announced its concerns about proceeding, through Claude Darmon’s ominous “NOT to proceed” direction contained in the December 16, 1999, e-mail from Francesco Star ace, did not, as a matter of law, constitute repudiations by either BVCI or Alstom of the obligations in the July 1998 document.
In the first place, BVCI did not refuse to proceed or otherwise repudiate the July 1998 document. Rather, it said it needed more money for certain labor-related aspects of the construction. The allegations in the complaint about BVCI’s alleged repudiation appear in para. 36, as follows:
In May 1999, Black & Veatch indicated that it would not perform its obligations under the Meriden Contract unless Meriden Power increased the total contract price by over $19 million. The parties *22 immediately initiated discussions in an effort to save the Meriden Project from failure and to resolve the issues raised by Black & Veatch’s repudiation of its contractual obligations.
To the extent the foregoing allegations are factual, they are binding on Meriden Power. G.L.c. 231, Sec. 87. To the extent the allegations include conclusions of law— e.g., “repudiation” — of course, they are not binding. Wasserman v. Tonelli, 343 Mass. 253, 257 (1961).
Meriden Power and BVCI proceeded, from May through November of 1999, to negotiate on the economic issues. They were on the verge of agreement when Alstom indicated that it may not perform under the July 1998 document. What BVCI did does not constitute a repudiation of any agreement it may have had.
Repudiation by one party, to be sufficient in any case to entitle the other to treat the contract as absolutely and finally broken and to recover damages upon a total breach, must at least amount to an unqualified refusal, or declaration of inability, substantially to perform according to the terms of his obligation.
Mobley v. New York Life Ins. Co., 295 U.S. 632, 638 (1935).
BVCI did not present an unqualified refusal to perform, a fact that is more than proved by the parties’ negotiations after May of 1999. Nor do BVCI’s actions constitute an anticipatoiy repudiation, which is not recognized in Massachusetts in any event. See, e.g., Cavanaugh v. Cavanaugh, 33 Mass.App.Ct. 240, 243-44 (1992).
Similarly, with respect to Alstom, the negotiations following whatever announcement it may have made in November of 1999 establish that there was not an unqualified refusal to proceed. Further, this lawsuit was filed on December 17, 1999, just one day after the Starace e-mail containing the Darmon comment.[7] Discussions between the parties continued until late January 2000. Again, there was no repudiation by Alstom here.
Given that the July 1998 document was not an EPC, or its functional equivalent, for the engineering, procurement or construction of the Meriden Project, no failure to proceed with such engineering, procurement or construction can be considered a breach thereof. Similarly, given that the actions of BVCI and Alstom did not amount to repudiations of the July 1998 document, the Court has searched — and cannot find — anything else in the very extensive summary judgment record that would constitute a breach. The utter absence of any evidence explaining why negotiations ceased after the end of January 2000 is telling.
Implied Covenant of Good Faith and Fair Dealing Issues
Having determined that there was no breach of the July 1998 document, the Court next looks to see if there was any breach of the implied covenant of good faith and fair dealing in connection therewith. Meriden Power’s motion papers provide guidance as to what it considers those breaches to be. Starting at p.45 and carrying through p.47 of Meriden Power’s opposition, it first describes what it does not allege as such a breach and then proceeds to state what it claims are breaches.
Plaintiffs do not allege that Alstom or B&V acted in bad faith when they executed the July Agreement in July 1998, or that defendants breached the covenant of good faith and fair dealing that would have been implicit in the final EPC that the parties had agreed to negotiate. Instead plaintiffs assert... that during the summer of 1999, after re-evaluating the economic prospects of the Meriden Proj ect, both Alstom and B&V engaged in unfair and bad faith acts that were designed to deprive plaintiffs of the “fruits” of the July Agreement and conceal from the plaintiffs their intention to breach the July Agreement . . .
Each defendant. . . acted in bad faith by demanding that plaintiffs make concessions from the commitments as to price, performance, and schedule established in the July Agreement. B&V . . . demanded that plaintiffs pay an additional $19 million allegedly attributable to increased costs of retaining construction labor for the Meriden Project
Alstom [on November 2, 1999] announced that turbines would not be available at the price and on the terms contemplated in the July Agreement. . .
These actions . . . constitute clear breaches of the duty of good faith and fair dealing contained in the July Agreement.
This Court disagrees. The reason for its disagreement rests with its determination above that the July 1998 document was not an EPC or equivalent contract to engineer, procure and construct the Meriden Project. Rather, it was just a starting point for the hard negotiations to follow on the EPC. Matters of additional labor costs pressed by BVCI, or the availability of turbines at the price and on the terms contemplated in July 1998, under the circumstances presented, do not supply the necessary proof of breaches of the implied covenant of good faith and fair dealing. This seems particularly so in the face of the continued negotiations — and near apparent resolution — of each of these issues.
The fruits of the July 1998 document, for Meriden Power at least, were the opportunity to negotiate in good faith with BVCI and Alstom in anticipation of an EPC contract and to have the monetary funding from Alstom and the permitting support services from BVCI during the development phase. Meriden Power was not deprived of these fruits.
*23 The cited actions by BVCI and Alstom did not have the effect of destroying or injuring the rights of Meriden Power to continue negotiating for an EPC for the Meriden Project. Unlike at Fan Pier, see Anthony’s Pier Four, Inc. v. HBC Associates, 411 Mass. 451 (1991), when it filed suit, Meriden Power did not have a history of a development agreement and a hotel ground lease, followed by three and a half years of architectural design work and coordinated planning, with a co-venturer, all terminated by a money-driven declaration: “We have no deal.” In this case, the we-have-no-deal moment never arrived, and negotiations were ongoing at, and after, the moment that this suit was filed.
There are no violations of the covenant of good faith and fair dealing implied in the July 1998 document shown on the record here.
Intentional Interference with Contract or with Advantageous Business Relationship
In order to prevail on claims of intentional interference with contractual or advantageous business relations, Meriden Power must prove that: “(1) [it] had a contract (or business relationship for economic benefit) with a third party; (2) [Alstom] knowingly and intentionally interfered with that contract or relationship; (3) [Alstom’s] interference was improper in motive or in means; and (4) [Meriden Power] was actually harmed by [Alstom’s] actions. See Harrison v. NetCentric Corp., 433 Mass. 465, 476 (2001); Kurker v. Hill 44 Mass.App.Ct. 184, 191 (1998).” Netherwood v. AFSCME, 53 Mass.App.Ct. 11, 21 (2001).
There was no contract or business relationship with which to interfere other than the July 1998 document. Because of this Court’s interpretation of the July 1998 document, there was no breach or interference with it by Alstom.
There also is no evidence of improper motive or means by Alstom. “The improper motive or means required is ‘actual malice.’ ” Shea v. Emmanuel College, 425 Mass. 761, 764 (1997). “Actual malice is any ‘spiteful, malignant purpose, unrelated to the legitimate corporate interest.’ ” Id. See also Schwanbeck v. Federal-Mogul Corp., 31 Mass.App.Ct. 390, 412-13 (1991). No actual malice is demonstrated on the record here.
Lastly, there is no showing of actual harm to Meriden Power. By its sale of the Meriden Project to NRG, Inc. for $24.5 million, Meriden Power much more than recovered its $8 million expenditure in the development phase following execution of the July 1998 document.
Misrepresentation
Meriden Power grounds its misrepresentation claim principally on an argument that Alstom, through many words and actions from the summer of 1999 until suitwas filed on December 17,1999, led Meriden Power to believe that there was a binding agreement to do more than just negotiate for an EPC. This is a kind of “stringing along” theory similar to that which the Supreme Judicial Court found wanting in Kuwaiti Danish Computer Co. v. Digital Equipment Corporation, 438 Mass. 459, 467-70 (2003).
Here, as in Kuwaiti Danish, and given the conclusions above about the limited extent of the July 1998 document, there can be no finding of any reasonable reliance by Meriden Power that it was entitled to anything more than what it received — assistance and funding for the permitting and development phase and an opportunity to negotiate in good faith toward an EPC. Id. at 467-69; Saxon Theatre Corp. v. Sage, 347 Mass. 662, 667 (1964) (“plaintiff could not reasonably rely on a representation of an intention to draw up and execute a mutually acceptable lease when essential terms of it had not yet been stated or settled”).
Further, and again given the determination above about the limited breadth of the July 1998 document, there is no evidence of detrimental reliance by Meriden Power. See Kuwaiti Danish, supra, 438 Mass, at 469-70. See also Hurwitz v. Bocian, 41 Mass.App.Ct. 365, 370-71 (1996). After Meriden Power, BVCI and Alstom stopped negotiating at the end of January 2000, Meriden Power ultimately sold the unconstructed and partially permitted Meriden Project and related land rights to an entity owned by NRG, Inc. for $24.5 million. As a result of that sale, Meriden Power sustained no out-of-pocket losses for the Meriden Project and, instead, made a handsome net profit after reimbursing itself for its costs.
The misrepresentation claim cannot succeed on this record.
Mass. G.L.c. 93A or Conn.
Gen. Stat. Secs. 42-110a-q
The most recent pronouncement by the Supreme Judicial Court of the test to be applied in a case under G.L.c. 93A involving trade or commerce appears in Morrison v. Toys “R” Us, Inc., Massachusetts, 441 Mass. 451 (2004). There,, at p. 457, the SJC said:
We have stated that “a practice or act will be unfair under G.L.c. 93A, sec. 2, if it is (1) within the penumbra of a common-law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injuiy to competitors or other business people.” . . . We emphasize, however, that G.L.c. 93A applies only to actions taken in the course of “trade or commerce,” . . . and has never been read so broadly as to establish an independent remedy for unfair or deceptive dealings in the context of litigation, with the statutory exception as to those “engaged in the business of insurance.”... We have stated that “[t]he purpose of G.L.c. 93A is to improve the commercial relationship between consumers and business persons and to encourage more equitable behavior in the marketplace.”
*24 This Court does not find that actions of either BVCI or Alstom, on the facts included in the summary judgment record and given this Court’s interpretation of the July 1998 document, to be within the penumbra of any common-law, statutory, or other established concept of unfairness; immoral, unethical, oppressive, or unscrupulous; or to have caused substantial injury to Meriden Power.
Further, the relationship between Meriden Power, BVCI and Alstom under the July 1998 document seems essentially, for purposes of the present motions, to be that of joint venturers. As such, they were, at least for much of what is before the Court, effectively partners, with fiduciary duties to each other. See, e.g., Cardullo v. Landau, 329 Mass. 5, 8 (1952). For that reason, however, they cannot be considered to be in “trade or commerce” with one another. See, e.g., Szalla v. Lock, 37 Mass.App.Ct. 346, 354 (1994). This is another reason why G.L.c. 93A cannot apply to this case.
Lastly, G.L.c. 93A only applies to actions which occur primarily and substantially within the Commonwealth. Kuwaiti Danish Computer Co., supra 438 Mass, at 471. Given the extensive activity in this matter that occurred outside of the Commonwealth— in Connecticut, Rhode Island, Missouri, Ohio, the District of Columbia, France and Switzerland, and perhaps The Netherlands and Belgium — this Court has serious doubts that the “center of gravity of the circumstances that give rise to the claims are primarily and substantially within the Commonwealth.” See id. at 473.
For all of these reasons, there is no basis for a claim pursuant to G.L.c. 93A.
The Connecticut Unfair Trade Practices Act (“CUTPA”), Conn. Gen. Stat. Secs. 42-110a through 42-1 lOq, provides no relief either. Sec. 42-11 Ob of CUTPA provides that “[n]o person shall engage in unfair methods of competition and unfair or deceptive acts of practices in the conduct of any trade or commerce.” This prohibition is not substantively different from the prohibitions of G.L.c. 93A. See Bailey Employment System, Inc. v. Hahn, 655 F.2d 473, 476 (2d Cir. 1981), wherein that court stated that “the pertinent provisions of the Massachusetts and Connecticut acts are nearly identical.”
The test applied in Connecticut for determining when a practice is unfair is essentially the same as that in Massachusetts;
(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [(competitors or other businessmen)].
Emlee Equipment Leasing Corporation v. Waterbury Transmission, Inc., 41 Conn.Sup. 575, 579, 3 Conn. L. Rptr. 711 (Conn.Super. 1991). See also A-G Foods, Inc. v. Pepperidqe Farms, Inc., 216 Conn. 200, 215 (1990).
CUTPA, like G.L.c. 93A, also has requirements that the activities challenged must be in the state. See Sec. 42-110a(4). Given the activity in Massachusetts, Rhode Island, Missouri, Ohio, the District of Columbia, France and Switzerland, and perhaps The Netherlands and Belgium, the center of gravity of the offending conduct is far from clearly having occurred in Connecticut.
This Court sees no basis to rule differently on the Connecticut unfair trade practices statute than on the Massachusetts equivalent.
ORDER
For the foregoing reasons, the motion for summary judgment by the defendant Black & Veatch Construction, Inc. (Paper #190) and the motion for summary judgment by the defendants Alstom Power, Inc. and Alstom Power, N.V. (Paper #191) are each ALLOWED, and a final judgment dismissing this action shall enter accordingly.

The word “agreement” is used by the plaintiffs in their complaint. It is quoted here by the Court as written. It is not, however, intended to have any legal effect, but merely to advise readers of the plaintiffs’ claim.

This information is relevant to material issues unrelated to settlement matters in this case and may thus be considered by this Court. Liacos, Brodin, Avery, Handbook, of Massachusetts Evidence, secs. 4.1.1 and 4.1.2 (7th Ed. 1999); Zueco v. Kane, 439Mass. 503, 510-11 (2003); Wagmanv. Ziskind, 234 Mass. 509, 511-11 (1920) (statements during settlement negotiations admitted to prove unrelated facts).

In Meriden Power’s opposition, at p. 10, it is stated: “Finally, in late January the parties met in Cincinnati. The Consortium presented a proposed EPC contract price of $256.6 million, again requiring reduced performance guarantees and warranties for the turbines . . . Such an increase from the price and terms agreed in the July Agreement was unacceptable to PDC.” There Meriden Power’s background facts end, with no mention or explanation of how, or if, its response to the Consortium’s proposal was communicated or whether there was any counter proposal thereto. In short, what happened next, at least on the record presented to the Court, seems to have faded into the mists.

The July 1998 document went through six drafts before its execution.

It is not without significance that Meriden Power knew nothing of Darmon’s comments until the e-mail was produced in pre-trial discovery in this case. To have repudiation, as charged in the December 17, 1999, complaint, there must have been an unqualified refusal to perform by Alstom conveyed to Meriden Power. The undisclosed Starace e-mail does not satisfy the legal test.